TIMOTHY A. TATARKA
PAULETTE L. STEWART
Assistant U.S. Attorney
U.S. Attorney's Office
James F. Battin U.S. Courthouse
2601 2nd Avenue North, Suite 3200
Phone:   (406) 657-6101
FAX:   (406) 657-6989
E-mail:   Tim.Tatarka@usdoj.gov
          Paulette.Stewart@usdoj.gov

ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 25-15-H-BMM |
| Plaintiff, | |
| vs. | UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS (DOC. 18) |
| RYAN CHRISTOPHER WILLIAMS, | |
| Defendant. | |

### INTRODUCTION

Ryan Williams chased a teen into a school zone, forced the student's vehicle

to a stop on the street fronting the school, and then exited his own vehicle with a

1

firearm to confront the student.   Williams pointed the firearm at the student, per the student's statement, and the state charged Williams with assault.   Williams acknowledge knowing he was within "about 100 yards" from the school and admitted he was armed.   Williams was subsequently indicted for violation of the Gun Free School Zones Act, 18 U.S.C. § 922(q)(2)(A).   He moves to dismiss on the ground that enforcing the act as applied to his conduct is unconstitutional under the Second Amendment.

As an initial matter, it is difficult to think of conduct more directly in the heartland of what Congress attempted to regulate with the Act than possession of a firearm while assaulting a student on the street adjacent to the school.   And the Ninth Circuit's binding precedent holds that the streets and sidewalks around sensitive place can themselves be considered sensitive places under the Second Amendment.   *Wolford v. Lopez* 116 F.4th 959, 982-85 (9th Cir. 2024); *see New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 30 (2022) (holding that the government may prohibit "the carrying of firearms in sensitive places such as schools and government buildings").

## FACTUAL BACKGROUND

On May 1, 2025, Lewis & Clark County Sheriff's Deputy Jeff Stolz responded to East Helena High School after a juvenile student reported someone

pointed a firearm at him while he was driving to school that morning.   The student provided a physical description of the suspect and the involved vehicle.

When questioned about the incident, the student said he was driving through a neighborhood to school and when he passed a vehicle heading in the opposite direction, it turned around and followed him.   The vehicle then began acting erratically before cutting off the student and pulling in front of his vehicle.   A man then got out of his car and approached the student's vehicle with a firearm in his hand and pointed it at the student, who was in the driver's seat.   The man admonished the student for his driving and the student apologized to placate the man.   The man then fled the scene and the student went to school, where he reported the incident to a member of the school administration.   The student described the man, his clothing, and the firearm.   The firearm was a small chrome or silver colored pistol.

The sheriff's office canvassed the area of the incident and located a vehicle matching the description provided by the student, parked at 2725 Bandera Drive in East Helena, Montana.   The vehicle was registered to Ryan Christopher Williams, and it was parked at Williams's residence.   Deputy Stolz called Williams at the residence and requested he come outside unarmed.   Williams complied and his physical characteristics matched the student's description.

3

During an interview with Stolz, Williams acknowledged the confrontation with the student and confirmed he pulled him over.   Williams said he verbally warned the student about his driving.   Williams acknowledged having the firearm with him during the incident, but claimed he never brandished it.   He claimed he took the firearm because he was dusting off his plane and didn't need it while he was at home and to prevent scratches.

Sheriff's deputies located the firearm on the rudder of the plane on William's property as they talked with Williams's father-in-law.   The firearm matched the description provided by the student, supporting the student's account of the assault.   While speaking with law enforcement, Williams possessed a magazine for the pistol.

Williams was ultimately arrested for assault with a weapon.

On May 2, 2025, ATF SAs Enk and Sutton interviewed Williams at the Lewis and Clark County Jail.   The statement was recorded.   After waiving his *Miranda* rights: Williams confirmed that he lived in the neighborhood across the street from East Helena High School; he stopped in front of the student's car to warn him about driving too fast; he confirmed that location of the stop – at the intersection of Valley Drive and Bandera Drive, which was right across the street from the school; he confirmed he possessed a firearm but denied unholstering the

4

pistol or pointing it at the student; he estimated that he was 100 yards from East Helena High School during the stop; he had not stopped anyone before this time; it was the first time that this car drove too fast through the neighborhood; he bought the pistol locally at Bob Wards or Capital Sports; he put it on the airplane when LCSO asked him to come out unarmed; his plane and landing strip are behind his house.

This incident was not the first time Williams was found to have acted dangerously with a firearm. In 2019, Williams followed a TSA agent he believed was harassing him and attempted to pull him over while armed with firearms and a tomahawk. A few days later, a female reported that she was being chased, that the vehicle sped past her and then slowed down to attempt to get her to stop her vehicle. Williams was stopped and law enforcement recovered a Kimber 9mm pistol. Williams admitted to chasing several people around town in his vehicle and that he believed people driving black cars were bad. Williams was taken into protective custody after being deemed a danger to himself and others.

More recently, on April 22, 2025, only a little over a week before the incident at the school, Williams was brought to a local urgent care for manic depression. Williams had a firearm in his waistband and threatened to shoot one

of his daughters.   Williams was again taken into protective custody after being

deemed a danger to himself and others.

ARGUMENT

I.    **The Second Amendment does not protect Williams's possession of
a firearm in a sensitive place adjacent to a school.**

As the Ninth Circuit has made plain, the Supreme Court's Second

Amendment precedents have repeatedly emphasized that bans on firearms in

sensitive places such as schools comport with the Second Amendment.   Binding

circuit precedent provides a sufficient basis for upholding Section 922(q)(2)(A) as

applied to the facts of this case.

In *District of Columbia v. Heller*, the Supreme Court held that the Second

Amendment guarantees "an individual right to keep and bear arms." 554 U.S. 570,

595 (2008).   But the Court emphasized that, like most rights, "the right secured by

the Second Amendment is not unlimited": it is "not a right to keep and carry any

weapon whatsoever in any manner whatsoever and for whatever purpose."   *Id.* at

626.   The Court thus cautioned that "nothing in [its] opinion should be taken to

cast doubt on … laws forbidding the carrying of firearms in sensitive places such

as schools and government buildings," among other "longstanding prohibitions."

*Id.* at 626-27.   The Court characterized these laws as "examples" of

"presumptively lawful regulatory measures," but emphasized that its list was not

6

"exhaustive." *Id.* at 627 n.26.   In *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), a plurality of the Court "repeat[ed *Heller*'s] assurances" about the constitutionality of laws prohibiting firearms in "schools."

The Court went further in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), expounding upon its earlier assurances regarding "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 30.   As the Ninth Circuit recognized in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), *Bruen* "provided specific guidance on the appropriate analysis when addressing the regulation of firearms in sensitive places in particular." 116 F.4th at 979.   It "assume[d] it settled that [legislative assemblies, polling places, and courthouses] were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 30).   It then empowered courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in <u>new</u> and analogous sensitive places are constitutionally permissible." *Id.* (quoting *Bruen*, 597 U.S. at 30).   This led to the conclusion that firearm bans "in sensitive places such as schools and government buildings," were justified "even if a modern-day regulation is not a dead ringer for historical precursors." *Bruen*, 597 U.S. at 30.

Carefully analyzing the logic of *Bruen*, *Wolford* explained,

> [t]he following regulations justified the Court's conclusion that legislative
> assemblies, polling places, courthouses, and schools were 'sensitive places'
> where firearms could be banned: a pair of Maryland statutes from 1647 and
> 1650 banning arms at legislative assemblies; a 1776 Delaware law and a
> 1787 New York law prohibiting arms at polling places, as well as some state
> laws enacted after 1868; a single 1786 Virginia law prohibiting arms at
> courthouses and a 19th Georgia law prohibiting weapons in a court of
> justice; and localized bans on carrying of firearms at a few schools
> beginning in 1824.

116 F.4th at 979 (citations omitted).   The Court then explained why the Supreme

Court appears to apply a more lenient standard with respect to sensitive places than

the broader ban at issue in *Bruen*:

> Our Nation has a clear historical tradition of banning firearms at sensitive
> places. When examining whether a <u>particular</u> place falls within that
> tradition, a small number of laws, even localized laws, can suffice, <u>if</u> those
> laws were viewed as non-controversial. Nor did the Founders have a rigid
> conception of what kinds of places qualified as sensitive. The Supreme
> Court held that schools qualify as sensitive places because of localized, non-
> controversial laws that prohibited firearms at a few schools, and those laws
> were first enacted in 1824—more than three decades after the ratification of
> the Second Amendment. The relevant tradition—regulation of firearms at
> sensitive places—existed at the Founding. Whether a place falls within that
> tradition requires an examination of laws, including 19th-century laws.

*Id.* at 980.

The Ninth Circuit's and the Supreme Court's statements provide a sufficient

basis for treating schools as "sensitive places" where "arms carrying could be

prohibited consistent with the Second Amendment."   *Bruen,* 597 U.S. at 30.   The

Supreme Court has repeatedly characterized schools as among the "longstanding"

8

sensitive places where arms-bearing may be limited.    *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 30.    And it suggested in *Bruen* that schools are sufficiently like the non-exhaustive list of "settled" locations where firearm possession may be "altogether prohibited."    *Bruen*, 597 U.S. at 30; see *also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 206 (S.D.N.Y. 2023) (reading *Bruen* to have "'assumed it settled that' schools full of children were 'sensitive places'" where arms carrying could be prohibited consistent with the Second Amendment").

That reasoning makes sense.    Courthouses and legislative assemblies, two of the "settled" sensitive places, *Bruen*, 597 U.S. at 30, serve an important public function whose purpose would be upended by the pervasive presence of firearms. *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 246 (2018); *see also Hill v. State*, 53 Ga. 472, 478 (Ga. 1874) (upholding a state statute that prohibited carrying weapons into a court of justice and explaining that "[t]he right peaceably to do any … public duty" is "seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for battle").    The same is true for schools.    Guns in and around schools make "teachers unable to teach" and "students unable to learn."    *United States v. Lopez*, 514 U.S. 549, 619 (1995) (Breyer, J., dissenting).    The presence of firearms thus "significantly undermine[s] the quality of education" in schools. *Id.*; *see also id.*

(reasoning that "guns and learning are mutually exclusive").   Consequently,

legislatures may limit firearm possession in schools to ensure that students "may

perform the purpose of their assembling unmolested by terror, or danger, or insult."

*Hill*, 53 Ga. at 478.

Applying this reasoning, the Ninth Circuit has expressly stated that schools

qualify as sensitive places.   *Wolford*, 116 F.4th at 979-80.   Indeed, Williams

himself concedes that bans on firearm possession in school buildings and school

grounds is constitutional. Doc. 19 at 4 ("[C]arrying guns in school buildings or on

school grounds has been consistently upheld as part of [this Nation's historical

tradition of firearm regulation].").

Williams's contention is that the ban is unconstitutional as applied to his

conduct, which included confronting a student in the street immediately fronting

the school.   Williams has acknowledged that he knew the student was headed to

the school and knew that the confrontation happened about 100 yards from the

school.

Fortunately, Ninth Circuit precedent has already confirmed that nearly

identical buffer zones are appropriately considered sensitive places for Second

Amendment purposes.   In *Wolford*, the court compared several locations including

playground and youth centers to schools to determine if they qualify as sensitive

places. *Wolford,* 116 F.4th at 982-985.   The court noted that the California law at issue prohibited carrying a firearm in a playground or youth center as well as the street or sidewalk immediately adjacent to the playground or youth center.   *Id*. at 985.   The court found that the plaintiff was unlikely to succeed on a Second Amendment challenge to that law.   *Id.*

Again, the logic of *Bruen* dictates this result.   It would make little sense to read *Heller*'s and *Bruen*'s approval of laws prohibiting firearm possession in schools as casting doubt on laws prohibiting firearm possession mere feet from school grounds and in firing range of its playground and classrooms, particularly where the conduct at issue was designed to impede the student's ability to reach the safety of the school grounds.   *See United States v. Class*, 930 F.3d 460, 464 (9th Cir. 2019) (explaining that "the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms" on property around the building as well); *see also United States v. Lewis*, Crim. No. 2008-45, 2008 WL 5412013, at *2 (D.V.I. Dec. 24, 2008) (holding that "*Heller* unambiguously forecloses a Second Amendment challenge" to Section 922(q)(2) because a school zone "is precisely the type of location of which *Heller* spoke"); *Frey*, 661 F. Supp. 3d 176, 206 (reading *Bruen* to "settle[]" the characterization of schools as "sensitive places").

Williams contends that ruling that the statute was constitutional as applied to his conduct would "limit a citizen's ability to protect themselves when confronted with a serious threat outside the home," and that he "believed that his Second Amendment constitutional rights protected his ability to travel to his home while carrying a firearm even if it came within 1000 feet of the school's property."   Doc. 19 at 6.   These statements simply ignore the facts of Williams's conduct—it is undisputed that Williams chased the student into the school zone, "pulled him over" to impede his reaching school grounds, and initiated a confrontation while possessing a firearm.   That Williams was the aggressor in this situation is further supported by the fact that he has a history of chasing and trying to stop cars he believes hold "bad guys" and only a little over a week earlier had threatened to shoot his daughter while at the urgent care for treatment for manic depression. There is simply no plausible contention here that Williams' firearm possession was necessary for self-defense or that he was merely traveling through the school zone to reach his home.  Williams's possession of firearms threatened students' ability "to freely and safely travel to and from" school, as well as their safety on school grounds within firing range.   *Class*, 930 F.3d at 464.

That reasoning is sufficient to reject Williams's as-applied Second Amendment challenge to Section 922(q)(2)(A).

12

## II.    Section 922(q)(2)(A) is consistent with our nation's historical tradition of firearm regulation.

Even if the Supreme Court has not definitively settled the question of

Section 922(q)(2)(A)'s constitutionality in this case, *Bruen*'s text-and-history

framework demonstrates that that provision passes constitutional muster.   The

Supreme Court has instructed that to assess whether a "challenged regulation is

consistent with the principles that underpin our regulatory tradition," courts "must

ascertain whether the law is 'relevantly similar' to laws that our tradition is

understood to permit," focusing on "[w]hy and how the regulation burdens the

right."   *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citation omitted).

Section 922(q)(2)(A) is consistent with various longstanding historical prohibitions

on gun possession in and around "sensitive places" like schools and polling places.

Those laws, in addition to historical restrictions on gun possession on university

campuses, reflect the principle that legislatures may prohibit firearm possession in

places where their presence would pose a heightened risk of danger and where

individuals need heightened protection from potential firearm violence.   Section

922(q)(2)(A) thus comports with the Second Amendment.

### A. Legislatures have long prohibited firearm possession in or near schools and universities.

Since shortly after the founding, legislatures have limited firearm possession

in schools, on school grounds, and in the area around schools.   And as firearms

13

became more deadly and school-related shootings increased, those restrictions proliferated across the country.   Section 922(q)(2)(A) is relevantly similar to those historical and longstanding restrictions.

### 1. Prohibitions on students' possession of arms on university campuses

The historical record yields several prohibitions on firearm possession on university campuses.   For example, an 1810 regulation at the University of Georgia "ordained" that "no student shall be allowed to keep any gun, pistol, … or any other offensive weapon in College or elsewhere," including "out of the college."   *The Minutes of the Senatus Academicus of the State of Georgia*, 1799-1842, at 86 (Aug. 1810).   The University of Virginia Board of Visitors, whose members included Thomas Jefferson and James Madison, implemented a similar restriction, resolving that "[n]o Student shall, within the precincts of the University, … keep or use weapons or arms of any kind, or gunpowder[.]" *University of Virginia Board of Visitors Minutes*, at 71-72 (Oct. 1824).   And in 1838, the University of North Carolina established that "[n]o Student shall keep … fire arms, or gunpowder."   *Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina*, at 15 (Sept. 1838).

14

Throughout the 1800s and early 1900s, similar restrictions were instituted at various colleges and universities throughout the country, including Waterville College in Maine, McKenzie College in Texas, Kemper College in Missouri, the University of Nashville, and Dickinson College in Pennsylvania.[1] Today, many states prohibit or strictly limit firearm possession on school grounds subject to certain exceptions.[2]   And in the absence of a relevant state statute, several universities and colleges have implemented policies regulating firearm possession and use on campus.[3]

### 2. Prohibitions on others' possession of arms on university campuses and at other schools.

---

[1] *See* Waterville College, Laws of Waterville College, Maine, at 11 (1832); "Laws of McKenzie College," in University of Texas, The Correlation of High School and College Courses in the Sciences, at 392-93 (1918); Kemper College, The Laws of Kemper College Near Saint Louis, Missouri, at 9 (1840); "University of Nashville," American Annals of Education and Instruction, for the Year 1837, at 7:185 (1938); Dickinson College, The Statutes of Dickinson College, at 22-23 (1830).

[2] *See, e.g.*, Ariz. Admin. Code § 7-4-102(3); Cal. Penal Code § 626.9(h), (i); D.C. Code § 7-2509.07(a)(2); Fla. Stat. § 790.115(2); Idaho Code § 18-3309(1), (2); Iowa Admin. Code 681-9.1(262)(g); La. Stat. Ann. § 40:1379.3; Md. Code Ann., Crim. Law § 4-111(d); Mass. Gen. Laws ch. 269, § 10(j); Neb. Rev. Stat. § 28-1204.04(1); N.J. Stat. Ann. § 2C:39-5(e)(1); N.M. Stat. Ann. § 30-7-2.4; N.Y. Penal Law § 265.01-a; N.C. Gen. Stat. § 14-269.2; S.C. Code Ann. § 16-23-420.

[3] *See* Giffords Law Center, Guns in Schools, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/guns-in-schools/(citing various school policies).

There is also a sufficiently longstanding tradition of legislatures restricting the carrying of firearms in or around other schools.    One of the first restrictions, an 1871 Texas law, prohibited "any person" from carrying "a pistol or other firearm" into (among other places) "any school room, or other place where persons are assembled for … educational or scientific purposes."    Act of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws. 25-26.    An 1878 Mississippi law prohibited university students from carrying a pistol or other concealed weapon.    Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 176.    Missouri also prohibited "any person" from carrying "any kind of fire arms" into, among other places, "any school room or place where people are assembled for educational, literary or social purposes."    Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76.    By the end of the 1800s, Arizona and Oklahoma had passed similar restrictions.[4]  And the legislative trend of restricting firearm possession in schools continued into the early 1900s. In 1903, Montana passed a law prohibiting individuals from carrying firearms into schools or other educational settings. Act of Feb. 27, 1903, ch. 35, § 3, 1903 Mont.

---

4 Act of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31 (prohibiting "any person" from having or carrying "about his person a pistol or other firearm" into "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes"); The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws 495-96 (similar).

Laws 49-50. In 1927, North Carolina did the same. Act of Feb. 12, 1927, §§ 1-5, 1927 N.C. Sess. Laws, Public-Local Laws 68.

There were understandably few 18th-, 19th-, and early 20th-century laws limiting firearm possession in and near schools. *Bruen*, 597 U.S. at 30. During that period, there were hardly any reports of school-related shootings. And owing to the cumbersome nature of firearms, there was likely little concern that individuals would use firearms to harm others. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," in Jennifer Tucker, *et al., A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019) (explaining that in early America, using a firearm to harm others was rare because muzzle-loading firearms had limitations as weapons). The most commonly used firearms often misfired, and with the exception of a few double-barreled pistols, they could not fire multiple shots. *Id.* at 117. And because firearms usually took at least a minute to load, they could not be used impulsively unless they were already loaded for some other purpose. *Id.*

Beginning in the mid-to-late 1800s, however, firearms became less unwieldy and more accessible. *Id.* at 121. In the ensuing decades, school shootings became more common. In response, states, territories, and municipalities increasingly restricted firearm possession and use in and near schools. Today,

17

nearly every state and territory prohibit firearm possession in schools, on school grounds, or near schools.

### B. Legislatures have long prohibited firearms possession around sensitive places like polling places and schools.

In addition to regulating firearm possession in schools and universities, legislatures have long prohibited individuals from possessing firearms in the area surrounding certain sensitive places.   In 1534, King Henry VIII issued a version of the Statute of Northampton, applicable to Wales, which prohibited arms within two miles of a court.   26 Hen. 8, c.6, § 6 (1534); *see Bruen*, 597 U.S. at 30 (characterizing "courthouses" as sensitive places).   At the founding, Delaware's constitution prohibited militias from assembling "within one mile of a polling place" during the 24 hours before the polls opened and until 24 hours after the polls closed.   Del. Const. art. 28 (1776).

Several states likewise passed laws prohibiting the carrying of arms around sensitive places.   In 1870, Louisiana passed a law prohibiting the carrying of firearms on election day and within a half mile of any place of registration or revision of registration.   Act of March 16, 1870, No. 100, § 73, 1870 La. Acts 159-60.   Texas also had a law that prohibited any person from carrying a firearm within a half mile of a polling place during polling hours.   2 A Digest of the Laws of Texas, Containing the Laws in Force, and the Repealed Laws on Which Rights

Rest, From 1754 to 1874, at 1317-18 (4th ed. 1874).   In 1874, Maryland banned

carrying arms in Kent County on election day, and 12 years later the Maryland

legislature passed a law prohibiting the carrying of arms "within 300 yards of the

polls on election day in Calvert County."   2 Public Local Laws of Maryland,

Articles 11-24, at 1457 (King Bros., ed. 1888); Act of April 7, 1886, ch. 189, 1886

Md. Laws 315.

Those prohibitions sometimes extended to the area surrounding schools.   In

1879, Missouri prohibited "any person" from discharging "any gun, pistol or fire-

arms of any description, in the immediate vicinity of any court house, church or

building used for school or college purposes."   Act of Apr. 30, 1879, § 1, 1879

Mo. Laws 90.   The statute defined "immediate vicinity" to mean "a distance not

exceeding two hundred yards."   *Id.* § 3, at 91.

### C. Section 922(q)(2)(A) is relevantly similar to these historical laws when considered together.

Section 922(q)(2)(A) is "relevantly similar" to historical laws and

regulations prohibiting the possession and carrying of arms on universities, in

schools, and around sensitive places like polling places.   *Rahimi*, 602 U.S. at 692.

Congress passed Section 922(q)(2)(A) as part of the Gun Free School-Zones

Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789, 4844.   Given the increasing

number of then-unprecedented shootings in and around schools, Congress

recognized that "ordinary citizens" may "fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason."   18 U.S.C. § 922(q)(1)(E).   Because of the impact school shootings have on "the quality of education in our country," *id.* § 922(q)(1)(F), and the difficulties that "[s]tates, localities, and school systems" had "handl[ing] gun-related crime by themselves," *id.* § 922(q)(1)(H), Congress passed Section 922(q)(2)(A) with the primary purpose of "ensur[ing] the integrity and safety of the Nation's schools," *id.* § 922(q)(1)(I).   *See also Lopez*, 514 U.S. at 619 (Breyer, J., dissenting) (explaining legislative background of the Gun Free School-Zones Act).

Historical restrictions on possessing arms in and around schools and other sensitive places had similar purposes to Section 922(q)(2)(A).   As the district court explained, gun violence threatens to subvert children from becoming educated which is their first duty as citizens.   Likewise, the historical prohibitions on carrying firearms in buffer zones around "sensitive places" are justified because they are "necessary to preserve the very root of republican government."

Section 922(q)(2)(A) also imposes burdens sufficiently similar to historical restrictions on possessing arms in and around schools and other sensitive places. Like historical laws restricting carrying firearms in or near schools, Section

20

922(q)(2)(A) is generally applicable to "any" person.   It is also not a total

prohibition on all persons carrying any firearm in the vicinity of a school under all

circumstances, it is thus less burdensome than historical restrictions on firearm

possession near polling places, which did not have carve outs.   *See* 18 U.S.C. §

922(q)(2)(B) (listing exceptions to general prohibition that allow possession of

firearm in school zones in certain circumstances, including by those on private

party or licensed by the state, or those traversing school premises if properly

stored).

Applying *Wolford*, banning firearms both within schools and in the area

immediately surrounding them has been non-controversial and is analogous to the

treatment of other sensitive areas throughout the nation's history.   116 F.4th at

980.   *Wolford* itself looked to restrictions on firearms surrounding schools in

determining that parks and playgrounds and the areas surround them were sensitive

places for Second Amendment purposes.   *Id.* at 982-985.

To be clear, this discussion of the statute's scope is not aimed at satisfying

the means-end scrutiny that *Bruen* rejected.   The point is that, for most law-

abiding citizens most of the time—i.e., in states with licensing requirements in

compliance with the statute—Section 922(q)(2) is more akin to a licensing

requirement than to a ban.   See 18 U.S.C. § 922(q)(2)(B)(ii).   When a law-

abiding citizen is on their own property, the statute is not a ban.   See 18 U.S.C. §

922(q)(2)(B)(i).   And even when a law-abiding citizen is in a State in which he is

not licensed, the statute is more akin to a transitory storage requirement than to a

ban.   See 18 U.S.C. § 922(q)(2)(B)(iii).   Understood in that properly cabined

way, Section 922(q)(2) is "relevantly similar" to the historical precursors below,

both in "how" and "why" it burdens "a law-abiding citizen's right to armed self-

defense."   *Bruen*, 597 U.S. at 29-30.   It does not matter that the precursors did not

ban everyone, always, from possessing firearms near a school, because Section

922(q)(2) does not do that either.

　　To be sure, Section 922(q)(2)(A) is not identical to the historical restrictions

discussed above.   "[B]ut it does not need to be."   *Rahimi*, 602 U.S. at 698.   Its

limited prohibition on firearm possession within a school zone fits comfortably

within the regulatory tradition that historical school-related and buffer-zone

restrictions "represent."   *Id.*

　　**D. Williams's as-applied challenge fails.**

　　As the Ninth Circuit has held, the streets immediately adjacent to a sensitive

place can constitute a sensitive place for purposes of firearm regulation.   Far from

being an exception, this case illustrates exactly why that area could reasonably be

considered sensitive by Congress.   Williams's protests that he was merely

"driving and walking on a public road well away from the main building [of] East Helena High School," Doc. 19 at 6, ignores the facts of his conduct.   Williams pursued a student he knew to be heading to the high school, impeded the student's ability to reach the safety of the school by "pulling him over," and assaulted him while possessing a firearm.

This conduct was much more egregious than the conduct the Fifth Circuit addressed when it found the Gun Free School Zones Act constitutional as applied. On June 16, 2025, the Fifth Circuit Court of Appeals handed down *United State v. Allam*, 140 F.4th 289 (5th Cir. 2025), addressing the constitutionality of 18 U.S.C. § 922(q)(2)(A).   Allam was arrested and charged after parking in the street next to a school and having a rifle and ammunition in his car.   *Id.* at 291.   Allam challenged the constitutionality of 18 U.S.C. § 922(q)(2)(A) both facially and as applied to the facts of his case.   The court held that "[t]he "why and how" of 18 U.S.C. § 922(q)(2)(A), as applied to Allam, are "consistent with the principles that underpin our regulatory tradition."   *Id.* at 299 (citing *United States v. Rahimi*, 602 U.S. 608, 692 (2024)).   The court analyzed the historical analogues and found the application of 18 U.S.C. § 922(q)(2)(A) to Allam constitutional.   *Id.* at 294-99.

Addressing Allam's as applied challenge the court held:

We need not—and do not—fix how far a buffer zone may stretch before it runs afoul of the Second Amendment to decide Allam's as-applied

23

claim. Section 922(q)(2)(A)'s buffer zone needed to do very little work here, if any. Allam had camped out only 40 feet from school grounds. His SUV was parked on a street bordering campus—adjacent to school zone lighting and signage—at a location where students crossed routinely to get to the off-campus basilica. He was also behaving erratically and menacingly, so much so that people repeatedly called the police, and St. Anthony changed its students' routines and traffic patterns. As applied here, § 922(q)(2)(A) is "relevantly similar" to the Statute of Northampton and going-armed laws and the (limited) historical examples of firearm restrictions in educational settings and buffer zones around polling places, which corroborate the constitutionality of disarming a visibly threatening individual as near a school as Allam was.

*Allam*, 140 F.4th at 299.   Williams much more clearly falls into the category of "a visibly threatening individual" "on the street bordering campus," than Allam.   *Id.* Williams actually crossed the line to assault.   And even if he had not, carrying a firearm while chasing down, impeding, and confronting a student is clearly conduct providing grounds for an individual to be constitutionally disarmed.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss should be denied.

DATED this 3rd day of November, 2025.

KURT G. ALME
United States Attorney


*/s/ Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant U.S. Attorney

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached response

contains 5,101 words, excluding the caption and certificate of compliance.

KURT G. ALME
United States Attorney


*/s/ Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant U.S. Attorney